IN THE U.S. DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ALTERRA AMERICA INSURANCE COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES W. FOWLER CO. an Oregon corporation; and NORTHWEST RENTAL EQUIPMENT, INC., an Oregon corporation,<br><br>Defendants. | Case No. 3:16-cv-00499-AA<br>**OPINION AND ORDER** |

AIKEN, District Judge:

This case arises out of an insurance contract between plaintiff Alterra America Insurance Company ("Alterra") and defendant James W. Fowler Company ("JWF"). Defendant suffered a loss of equipment and made a claim pursuant to the contract which was paid in part and denied in part by plaintiff. Plaintiff filed the present suit seeking declaratory relief that it has satisfied the terms of the insurance agreement. Defendant filed affirmative defenses and raised counterclaims against plaintiff for breach of insurance contract, promissory estoppel, reformation, bad faith claims handling, declaratory judgment, and violations of Washington's Consumer Protection Act

("CPA") and Washington's Insurance Fair Conduct Act ("IFCA"). Plaintiff now moves for partial summary judgment (doc. 53) on its claim for declaratory judgment that it fulfilled its obligations under the coverage in effect at the time of the loss. Plaintiff also seeks summary judgment in its favor regarding defendant's counterclaims for breach of contract, promissory estoppel, reformation, and declaratory judgment. Plaintiff also moves for partial summary judgment (doc. 37) in its favor on three of defendant's counterclaims for bad faith claims handling as well as the alleged violations of Washington's CPA and IFCA. Defendant has also filed a cross-motion for summary judgment (doc.55) regarding the choice-of-law on these counterclaims. For the reasons that follow, Defendant's motion (doc.55) is DENIED and plaintiff's motions (docs. 37 and 53) are GRANTED.

## BACKGROUND

Defendant JWF is a diversified general contractor that provides heavy civil and tunneling construction solutions to municipalities, agencies, and private owners across North America.[1] Defendant is incorporated in Oregon and is registered to do business in Washington, Hawaii, Oregon, California, and North Dakota, among other states.

Plaintiff is incorporated in Delaware and has its principal place of business in Virginia. Plaintiff sole agent in Washington was Parker Smith & Feek ("PS&F"), an insurance producer and defendant's insurance broker. PS&F is incorporated and has its principal place of business in Washington. At all relevant times in this case PS&F's office was in Washington.

To insure its equipment from damage or loss, JWF purchased contractor's equipment insurance coverage from plaintiff through PS&F and paid its premiums to PS&F. Thus, plaintiff has provided contractor's equipment coverage to JWF since 2011. Kathy Bare was the primary

---

[1] Defendant, Northwest Rental Equipment, was a named insured under the insurance coverage at issue and is owned by the ownership group as defendant JWF.

contact at PS&F for both JWF and Alterra. JWF renewed its contractor's equipment coverage with Alterra each year from 2012 through 2015 through PS&F.

In August 2013, defendant entered into a contract with the North Dakota State Water Commission to construct approximately 2,800 lineal feet of pipeline under Lake Sakakawea near Beulah, North Dakota. The project called for lake water to be pumped from the bottom of the Lake Sakakawea, piped to the shore, and screened by a water treatment plant operated by the North Dakota State Water Commission. The treated water would then be used to supply potable water for both domestic and livestock use in Southwest North Dakota.

In August 2015, PS&F sent a letter to JWF starting the renewal process for the 2015-2016 policy period effective November 1, 2015 to November 1, 2016. In October 2015, JWF prepared to renew its insurance. It updated and revised its original Equipment Schedule, listing the machinery, equipment, and tools that it wanted to insure under the next policy. JWF provided that Revised Equipment Schedule to PS&F, which in turn provided it to Alterra on October 16, 2015.

On or about October 28, 2015, Alterra issued a renewal binder to JWF for commercial output insurance coverage effective during the November 1, 2015 to November 1, 2016 coverage period. The renewal binder contained the Revised Equipment Schedule submitted by JWF on October 16, 2015, identifying the individual items of contractors' equipment covered and their respective limits. According to the Renewal Binder, the Contractors Equipment coverage was subject to limits of $9,306,134.

While working on the North Dakota Project, JWF employed a Micro-Tunnel Boring Machine ("MTBM") and other related equipment to tunnel horizontally under the lake in order to install an underground intake pipeline. Early on November 1, 2015, the first day of the policy,

while defendant was working on project, the tunnel caved in and caused a total loss of some of JWF's equipment. JWF made a claim under the policy seeking to recover for the lost equipment.

Twelve days later, on November 13, 2015, JWF submitted to Alterra, through PS&F, a Revised Equipment Schedule with deletions and additions of various equipment, revisions of the stated equipment values, and other modifications. Some of the added equipment to be covered by the policy included the equipment lost in the North Dakota cave-in. One such item that was listed on the November 13, 2015 Equipment Schedule—that was previously unlisted—was an "Umbilical system" with a reported value of $2,926,300. The umbilical system was comprised of a collection of equipment put together to create one line-time for the November 13, 2015 Revised Equipment Schedule. Some of the equipment in the system had been included in the October 16, 2016 Revised Equipment Schedule.

From January to March, 2016, Alterra issued payments to JWF for items listed on the October 16, 2015 Amended Equipment Schedule, including a payments for five components of the umbilical system which were listed in that Amended Equipment Schedule, for a total amount of $2,255,134. However, the remaining amount associated with the umbilical system as listed in the November 13, 2016 Revised Equipment Schedule was not reimbursed to JWF, on the basis that it was not included in the October 16, 2015 Revised Equipment Schedule. *Id.*

Plaintiff then filed the present action on March 24, 2016 before this Court seeking a declaratory judgment that it had no duty to indemnify JWF for the loss of any equipment not included in the October 16, 2015 Revised Equipment Schedule. The parties have filed several motions for the Court's consideration. The parties have filed Cross-Motions for Summary Judgment (doc. 37 and 55) on whether Oregon or Washington law applies to defendants'

counterclaims. Plaintiff has also filed a Motion for Partial Summary Judgment (doc. 53) on its declaratory relief claims, as well as defendants' counterclaims. I address each motion in turn.

LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "is relevant to an element of a claim or defense and [its] existence might affect the outcome of the suit." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T. W. Elec.*, 809 F.2d at 630. "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving patty, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

When cross-motions for summary judgment are presented, the court must "review the evidence properly submitted in support of [each] motion to determine whether it present[s] a disputed issue of material fact[.]" *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1135 (9th Cir. 2001). The court must evaluate each motion independently on its own merits. *Id.* at 1136.

The interpretation of an insurance policy is a matter of law. *Emp 'rs Ins. of Wausau v. Tektronix, Inc.*, 156 P.3d 105, 116 (Or. Ct. App. 2007). The court's objective in construing an

insurance contract is to determine the intent of the parties. *Hoffman Constr. Co. of Alaska v. Fred S. James & Co.*, 836 P.2d 703, 706 (Or. 1992). To make that determination, the court uses a three-step process. *Id.* at 706-07. The first step is to examine the text of the policy to determine whether it is ambiguous, that is, whether it is susceptible to more than one plausible interpretation. *Tualatin Valley Haus. v. Truck Ins. Exch.*, 144 P.3d 991, 993 (Or. Ct. App. 2006). The court will apply any definitions that are supplied by the policy itself and will otherwise presume that words have their plain, ordinary meanings. *Id.* If a term has only one plausible interpretation, it is interpreted in accordance with that unambiguous meaning. *Andres v. Am. Standard Ins. Co.*, 134 P.3d 1061, 1063 (citing *Hoffman*, 836 P.2d at 706). If the wording of the policy is susceptible to more than one plausible interpretation, the court must examine the disputed terms in the context of the policy as a whole. *Id.* As a last resort, the courts resolves ambiguity by construing the tern against the drafter—generally, the insurance company. *Hoffman*, 836 P.2d at 706-07. In the context of insurance contracts, courts determine plain meaning from the perspective of a reasonable insured. *Id.*

The insured bears the initial burden of proving that a loss is covered under an insurance policy, while the insurer bears the burden of proving that a loss is excluded from coverage. *Wausau*, 156 P.3d at 119. It is also the insured's burden to establish that a claim is within an exception to an exclusion. *Id.* at 121-22.

## DISCUSSION

I. *Choice of Law Dispute*

The parties contest whether Oregon or Washington law governs defendants' counterclaims. I find that Oregon law, not Washington law, applies to defendants' counter claims in this case. Thus, defendants' counter claims for bad faith claims handling as well as

violations of Washington's CPA and IFCA are not actionable under Oregon law, and those claims must be dismissed.

Because JWF and Alterra are citizens of different states and the amount in controversy exceeds $75,000, the United States District Court for the District of Oregon has diversity jurisdiction over this case pursuant to 28 U.S.C § 1332. Additionally, under 28 U.S.C § 1391, venue is proper because defendant JWF is a citizen of the Oregon and has its principal place of business in this District.

A federal court sitting in diversity uses the choice of law rules of the forum state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Oregon's common law, the first step is to determine whether there is a material difference between the substantive law of the states whose law may apply. *Angelini v. Delaney*, 156 Or. App. 293, 300 (1998). If there is no material difference, Oregon law applies. *Powell v. System Transp., Inc.*, 83 F. Supp. 3d 1016, 1022 (D. Or. 2015), citing *Waller v. Auto-Owners Ins. Co.*, 174 Or. App. 471, 475 (2001). When there is a material difference, the court proceeds with Oregon's choice of law rules. *Id.* at 1022-23.

Or. Rev. Stat. § 15.440 outlines Oregon's choice of law analysis for non-contractual claims between injured persons and the person whose conduct caused the injury. Section (2) of the statute provides:

> [i]f the injured person and the person whose conduct caused the injury were domiciled in the same state, the law of that state governs. . . . persons domiciled in different states shall be treated as if domiciled in the same state to the extent that laws of those states on the disputed issues would produce the same outcome."

Or. Rev. Stat. 15.440(2)(a-b).

The statute further notes that if the injurious conduct occurred in one state and the resulting injury in another state, then the law of the state of conduct governs. Or. Rev. Stat. §

15.440(3)(c) Alternately, the state where the injury occurred governs if "the activities of the person whose conduct caused the injury were such as to make foreseeable the occurrence of injury in that state; *and*" . . . "[t]he injured person formally requests the application of that state's law by a pleading or amended pleading." Or. Rev. Stat. § 15.440(3)(c)(a)-(b). The statute carves out a narrow exception under § 4, whereby a party may apply the law of a state outside of that state designated under sections (2) and (3) if the application of that state's law is "substantially more appropriate."

Additionally, Oregon courts rely on the principles set forth in the general and residual approach of Or. Rev. Stat. § 15.445 to determine whether another state's law is substantially more appropriate. Under the residual approach outlined in § 15.445, a court considers the following factors:

> (1) Identifying the states that have a relevant contact with the dispute, such as the place of the injurious conduct, the place of the resulting injury, the domicile, habitual residence or pertinent place of business of each person, or the place in which the relationship between the parties was centered;
>
> (2) Identifying the policies embodied in the laws of these states on the disputed issues; and
>
> (3) Evaluating the relative strength and pertinence of these policies with due regard to:
>
>> (a) The policies of encouraging responsible conduct, deterring injurious conduct and providing adequate remedies for the conduct; and
>>
>> (b) The needs and policies of the interstate and international systems, including the policy of minimizing adverse effects on strongly held policies of other states.

Here, applying Washington law to the present case is not substantially more appropriate than applying Oregon law. The claim was brought by a non-Washington residents against another non-Washington resident. JWF is domiciled in Oregon, and Alterra is domiciled in Virginia. The claim concerns conduct that took place outside of Washington, and it concerns an

alleged injury outside of Washington. As a matter of law, there is nothing injurious to Washington's public interest that would persuade the court to apply Washington law. Additionally, the private interests factors involved do not make litigating the matter in Washington substantially more appropriate than litigating the matter in Oregon.

The states with relevant contacts to this dispute are Oregon and Virginia. Oregon is where JWF is domiciled, where JWF's place of business is located, where it will suffer any resulting injury if it does not receive insurance benefits, and where JWF often communicated about the claim directly with Alterra. Virginia, Alterra's principal place of business, is where the claim decisions were made. Washington's contacts related to JWF's claim are minimal, weakening the contention that Washington law is substantially more appropriate to resolve the disputed issues than Oregon law. Regarding public policy interests, "Oregon has a substantial interest in adjudicating disputes involving Oregon residents." *Exp. Global Metals, Inc. v. Memking Recycling Group*, LLC, 2013 U.S. Dist. LEXIS 154379, *14 (D. Or. Sept. 26, 2016).

In this case, I hold that the Court must apply the law of the forum state in which it sits, Oregon. Moreover, Oregon law, not Washington law, applies to defendants' counter claims for bad faith claims handling and violations of the Washington's CPA and the IFCA. As Oregon law does not recognize the three claims in question, they are dismissed.

II. *Plaintiff's Claim for Declaratory Relief*

Next, I turn to defendant Motion for Partial Summary Judgment on its claim for declaratory relief. I hold that there was no coverage for the equipment, including parts of the "Umbilical" system, lost as a result of the November 1, 2015, North Dakota Project tunnel collapse which was not included in the October 16, 2015 Revised Equipment Schedule..

Or. Rev. Stat. § 15.360 provides that the rights and duties of parties to an insurance contract are governed by the "most appropriate" state law for resolution of the issue. At issue here is an insurance policy issued with Oregon Amendatory Endorsements, covering Oregon property, issued to an Oregon corporation with its principal place of business in Oregon. Therefore, Oregon law applies.

The interpretation of an insurance policy's terms is a question of law that must be decided by the court. *St. Paul Fire & Marine Ins. Co. v. McCormick & Baxter Creosoting Co.*, 324 Or. 184, 192 (1996). "The primary and governing rule of the construction of insurance contracts is to ascertain the intention of the parties." *Hoffman Constr. Co. v. Fred S. James & Co.*, 313 Or.464, 469 (1992), quoting *Totten v. New York Life Ins. Co.*, 298 Or. 765, 770 (1985). The intention of the parties is determined by the reviewing terms and conditions set forth in the insurance policy. *Id.*

Oregon courts follow a series of analytical steps to interpret disputed policy provisions. *Id.* at 474-75. First, the court examines the wording of the policy and applies the policy definitions and the plain, ordinary meanings for the terms within the policy. *Id.* Next, if more than one construction is plausible, then the court scrutinizes the ambiguous term "in light of the context in which it is used and in light of the other provisions of the policy." *Id.* If only one interpretation of the provision is reasonable, that interpretation controls. *Id.* Alternatively, if more than one purported interpretation is reasonable, then the term must be interpreted against the drafter of the language. *Id.* at 470; *see also Travelers Indem. Co. v. United States*, 543 F.2d 71, 74 (9th Cir. 1976) (maxim of interpretation against insurer does not apply when insured provides language). Oregon courts do not consider extrinsic evidence when interpreting insurance policy language. *Rhiner v. Red Shield Ins. Co.*, 228 Or. App. 588, 593 (2009). To

Oregon courts, the interpretation of an insurance policy is a "question of law that is confined to the four corners of the policy without regard to extrinsic evidence." *Id; see also In re Helicopter Crash Near Weaverville*, 714 F. Supp. 2d 1098 (D. Or.2010).

Oregon's rules of interpretation apply to binders. Or. Rev. Stat. § 742.016. "Except as provided in ORS 742.043, every contract of insurance shall be construed according to the terms and conditions of the policy." *Id.* A binder[2] is temporary insurance contract "until such time as issuance of permanent insurance is approved or disapproved or some other temporary impediment is removed." *United Pac. Ins. Co. v. Truck Ins. Exch.*, 273 Or. 283, 289-90 (1975). Oregon courts also rely on Black's Law Dictionary 161 (7th ed. 1999), which defines binder as "an insurer's memorandum giving the insured temporary coverage while the application for an insurance policy is being processed or while the formal policy is being prepared." *Baylor v. Continental Cas. Co.*, 190 Or. App. 25, 33 (2003). Binders may be made orally or in writing and, while they do not need to contain all necessary elements of an insurance contract, they must include sufficient information to determine the coverage which the parties are contracting for. *Id.* at 290. (internal citations omitted.)

Lastly, "[w]hen a written instrument refers in specific terms to another writing as containing part of the agreement, the other writing is itself part of the contract between the

---

[2] Or. Rev. Stat. § 742.043 provides that :

(1) Binders or other contracts for temporary insurance may be made orally or in writing, and shall be deemed to include all the usual terms of the policy as to which the binder was given together with such applicable endorsements as are designated in the binder, except as superseded by the clear and express terms of the binder.
(2) Except as provided in subsection (3) of this section and ORS746.195, within 90 days after issue of a binder a policy shall be issued in lieu thereof, including within its terms the identical insurance bound under the binder and the premium therefor.

parties." *Snow Mountain Pine v. Tecton Laminates Corp.*, 126 Or. App. 523, 528-29 (1994), (quoting *Weber v. Anspach*, 256 Or 479, 483 (1970)).

Here, the loss of defendants' umbilical system is not covered by the terms of the Renewal Binder. The Renewal Binder at issue is unambiguous. Under its plain terms, Contractors Equipment coverage is subject to a limit of $9,306,134, per the schedule dated October 16, 2015. This language has one reasonable meaning—the Contractors Equipment coverage is limited to the equipment on the October 16, 2015 Revised Equipment Schedule. The Renewal Binder specifically references to the October 16, 2015 Revised Schedule. That schedule is, therefore, part of the Renewal Binder and limits the amount of coverage available to JWF for each item of equipment. Alternate interpretations of the Renewal Binder are not plausible. There is only one equipment schedule dated October 16, 2015, and the Scheduled Equipment limit in the Renewal Binder of $9,306,134 matches the values on the October 16, 2015 Revised Equipment Schedule. The Contractors Equipment coverage set forth in the Renewal Binder is subject to the October 16, 2015 Revised Equipment Schedule. Thus, the Renewal Binder should be enforced as written.

Defendant argues that the record shows that the parties manifested their intent to insure all equipment being used on the North Dakota Project starting on November, 1 2015. Moreover, JWF points to emails contemporaneous to the issuance of the renewal binder which it argues shows that the parties agreed to revise the Equipment Schedule in future.

Indeed, on October 23, 2015, prior to the issuance of the Renewal binder, Kathy Bare of PS&F had a meeting with JWF to discuss contractor's equipment coverage. At that meeting, JWF raised the concerns that the equipment schedule may be incomplete and may have low values. At the meeting, PS&F and JWF also discussed whether the scheduled equipment values

Page 12 – OPINION AND ORDER

would be the limit of insurance for a single piece of equipment or whether the overall scheduled equipment value would control.

In an October 28, 2015 email to Bare, Philip Nelson, Vice President for Underwriting for Alterra, wrote, "[w]e will issue a new policy this year and your new number is on the binder. Also, we'll adjust accordingly after they have had had an opportunity to review their equipment schedule and values." Butler Decl., Ex. I. Nelson also noted in deposition that there would be some expected changes in values once JWF submitted a new equipment schedule.

Defendant argues that these statements and other are part of the insurance agreement itself. However, plaintiff persuasively argues that this was at best an agreement to negotiate a new contract in future, rather than an unqualified agreement to cover all equipment communicated at a future date from the date of the binder's inception. There was no agreement as to what else was to be covered or the premiums to be paid, or any allusions in the binder itself to an agreement to receive a new schedule. I am bound to give effect to the terms of the renewal binder and "not to insert what has been omitted, or to omit what has been inserted" in construing the agreement. Or. Rev. Stat. § 42.230. The binder itself does not reference a forthcoming revised schedule, rather it only references the October 16, 2016 Revised Equipment Schedule. Therefore, on November 1, 2015, coverage only existed for the equipment listed in the October 16, 2016 schedule. Plaintiff is entitled to summary judgment in its favor regarding its claim for declaratory judgment.[3]

---

[3] Plaintiff also argues that defendant interpretation of the contract would negate the nature of fortuitous risk under Oregon law, as it would require plaintiff to insure equipment that the insured already knew was destroyed. I need not address the argument as I have already held that the terms of the renewal binder created coverage only for equipment listed in the October 16, 2015 Revised Equipment Schedule.

Page 13 – OPINION AND ORDER

Plaintiff also moves for summary judgment on plaintiff counterclaims for breach of contract, promissory estoppel, reformation, and declaratory judgment. My consideration of these claims turns heavily on my ruling granting summary judgment on plaintiff's declaratory judgment claim. I briefly address each issue in turn.

Plaintiff is entitled summary on defendant's counterclaim for breach of contract. I have held that express terms of the Renewal Binder governed coverage for the loss. It is not disputed that plaintiff made payments pursuant to October 16, 2015 Revised Equipment Schedule referenced in the Renewal Binder. Moreover plaintiff repaid any unearned premiums, and it did not violate any terms of the renewal binder dealing with claims handling.

Likewise defendant's counter claims for promissory estoppel should also be dismissed. Promissory estoppel is not a separate cause of action, even though a party may plead it separately. *Glob. Exec. Mgmt. Sols., Inc. v. Int'l Bus. Machines Corp.*, 260 F. Supp. 3d 1345, 1381 (D. Or. 2017) (citing *Kraft v. Arden*, 2008 WL 4866182, at *10 & n.4 (D. Or. Nov. 7, 2008)). Instead it "'is a subset of and a theory of recovery in breach of contract actions.'" *Id.* (quoting *Neiss v. Ehlers*, 135 Or.App. 218, 227–28, 899 P.2d 700, 706 (1995)). While a theory of recovery in such claims, "[p]romissory estoppel does not apply when a valid contract exists." *Id.* Here, the Renewal Binder was valid and unambiguous, and it did not contain any terms alluding to the receipt of future Revised Equipment Schedules. By the terms of thsi contract at the time of the loss, the only equipment to be covered was listed in the October 16, 2015 Revised Equipment Schedule. Thus, plaintiff is entitled to summary judgment on this counterclaim as well.

Plaintiff is also entitled to summary judgment on defendant's counterclaims for reformation. There is no evidence outside of the October 16, 2015 Revised Equipment Schedule

that the parties agreed on what additional equipment, if any, would be insured under the policy or the amount of insurance on such equipment or the premiums to be paid. Moreover there is no evidence that Alterra ever agreed that the any later Revised Schedules would be effective as of the inception date of the agreement. Apart from the Renewal Binder, itself, there is evidence of a prior agreement to which the policy could be reformed. Thus, plaintiff is entitled to summary judgment on this counterclaim as well.

Finally, defendant's counterclaim for declaratory relief asks for *inter alia* a declaration that the November 12, 2015 Revised Equipment Schedule governs the November 1, 2015 loss and that Alterra is in breach of the insurance policy and it's good faith obligations. I have already held that the Renewal Binder is unambiguous and limits the Contractors Equipment coverage to the October 16, 2015 Revised Equipment Schedule. Thus, summary judgment on this counter claim is granted in favor of plaintiff.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

For the reasons set for the herein, plaintiff's Motion for Partial Summary Judgment (doc. 37) is GRANTED and defendant's Cross Motion for Summary Judgment (doc. 53) is DENIED. Plaintiff's Motion for Partial Summary (doc. 53) regarding its declaratory relief claim is GRANTED. Plaintiff's motion for Protective Order (doc. 44) is DENIED. The Motion for Extension of discovery and PTO deadlines is GRANTED in part and DENIED in part to the extent that parties still require any additional time to complete any remaining discovery or engage in additional motion practice.[4] The parties shall file a Joint Status Report no later than 21 days from this order outlining any issues including proposed scheduling orders for the Court's consideration.

IT IS SO ORDERED.

Dated this 30th day of September 2018

*Ann Aiken*
Ann Aiken
U.S. District Judge

---

[4] A pretrial order has already been filed. (doc. 71)